UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                              Chapter 11

Iron Horse Bicycle Company, LLC,                    Case No. 809-71324-ast

                              Debtor.
-------------------------------------------------------X

**APPEARANCES:**

Andrew M. Thaler, Esq.
Thaler & Gertler
90 Merrick Avenue
Suite - 400
East Meadow, New York 11554

Douglas E. Spelfogel, Esq.
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016

Ronald M. Terenzi, Esq.
Stagg, Terenzi, Confusione, & Wabnik, LLP
401 Franklin Avenue
Garden City, New York 11530

Alfred M. Dimino, Esq.
Office of the United States Trustee
Long Island Federal Courthouse
560 Federal Plaza - Room 560
Central Islip, New York 11722-4437

J. Gregory Barrow, Esq.
General Capital Partners, LLC
600 17th Street, Suite 2350 South
Denver, Colorado 80202

## MEMORANDUM OPINION ON APPLICATION FOR FEES AND EXPENSES
## OF MARKETING AGENT / FINANCIAL ADVISOR

## Issues Before the Court and Summary of Ruling

Pending before the Court is the application for fees and expenses of General Capital Partners, LLC ("GCP" and the "GCP Application"). Objections to the GCP Application have been filed. For the reasons herein, this Court has established the standard under which a final award should be considered, but defers final determination of GCP's request until after resolution of certain other matters pending in this case.

## Jurisdiction

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and 1334(b), and the Standing Order of Reference in effect in the Eastern District of New York.

## Procedural History

On March 2, 2009, an involuntary petition for relief under Chapter 7 of the United States Bankruptcy Code (the "Petition Date") was filed by various petitioning creditors (the "Petitioning Creditors") against Iron Horse Bicycle Company LLC, f/k/a, a/k/a, d/b/a Iron Horse Bicycle Company, Inc. ("Iron Horse"), as alleged debtor. [dkt item 1]  On April 1, 2009,  Iron Horse filed a statement wherein it consented to an Order for Relief being entered, conditioned upon the case being converted to a case under chapter 11 of the Bankruptcy Code. [dkt item 15]  An Order approving the conversion of this case to a voluntary chapter 11 case was entered on April 6, 2009. [dkt item 18]  An official committee of unsecured creditors was appointed on May 14, 2009 (the "Committee"). [dkt item 61]

On May 20, 2009, Debtor filed a motion (the "Motion") to approve the sale of

substantially all of its assets pursuant to a certain Asset Purchase Agreement dated as of June 15, 2009 (as amended, the "Agreement") by and among Outdoor Cycle Group LLC  ("Outdoor Cycle"), Debtor, and Iron Horse Bicycle Company, Inc. ("IH Inc."). [dkt item 66]  IH Inc. is, for purposes of this opinion, a nondebtor affiliate of Debtor.[1]  The Motion requested authority to sell substantially all of the assets of Debtor and IH Inc. to Outdoor Cycle for the aggregate consideration of $2 million, subject to higher and better offers, and to establish bid procedures for a sale process.[2]  The sale as proposed did not allocate the sales proceeds as between Debtor and IH Inc.  If such a sale had been approved and closed for $2 million, the vast bulk or all of the sale proceeds would have been paid to CIT Group, which held a prepetition lien against substantially all of Debtor's and IH Inc.'s assets.  An emergency hearing to consider bid procedures was scheduled for May 28, 2009 (the "May 28 Hearing").

An objection to the Motion and proposed sale was filed by the Petitioning Creditors. [dkt item 73]  At the May 28 Hearing this Court expressed concerns about embarking on a sale process that may not provide benefit to unsecured creditors, especially considering the request to sell both the Debtor's and the non-debtor's assets in one sale, with no allocation being made between the entities, and both entities having pledged substantially all assets to CIT.  The May 28 Hearing was adjourned to June 8, 2009 (the "June 8 Hearing").

---

[1]  IH Inc. is the subject of an adversary proceeding prosecuted by the Committee, in which the estate claims, *inter alia*, that IH Inc. is an alter ego of Debtor. (Adv. Proc. No. 09-8339)("IH Adversary")  IH Inc. is owned or controlled by the president of Debtor. This Court approved a stipulation under which the Committee was given the authority to prosecute the IH Adversary on behalf of the estate. [IH Adversary, dkt item 4]

[2]  This sale would have included fixed assets, as well as the trademarks, patents, inventory, and other interests of Debtor and IH Inc.

On June 2, 2009, this Court issued a Scheduling Order for the June 8 Hearing. [dkt item 86]  Numerous additional objections were filed to the Motion, including an objection from the Committee. [dkt items 92, 93, 94, 97, 98, 99]  These objections included concerns about the affiliate relationship of Debtor with IH Inc. and various other allegations regarding the prepetition conduct of Debtor's prepetition officers and agents.

Included in the Committee's objection was a request regarding advertising of the sale on a number of specific websites. [dkt item 98,¶ 19]  In addition, the Committee stated it wanted to retain GCP to assist in the auction process:

> The Committee also suggests that the firm of General Capital Partners ("GCP") be retained to help market the sale, ferret out potential bidders, offer the assets as one unit or components and compare offers to determine the best sale configuration, contact them directly and negotiate with perspective purchasers to obtain the highest possible bid. . . . The Committee believes that this service will add value in helping to obtain the highest possible bid as well as bringing an objective oversight to the process which will remove any specter of impropriety.

[dkt item 98, ¶ 21]  GCP's proposed retainer agreement attached to the Committee's Objection proposed a $20,000.00 retainer fee of which $10,000.00 would be paid up front, plus a 10% commission on sale proceeds between $2 million and $3 million, plus 6% on sales proceeds above $3 million.  No application to retain GCP was filed prior to the June 8 Hearing.

GCP was not at the June 8 Hearing.  At the June 8 Hearing, another potentially interested purchaser, Pacific Cycle, Inc. ("Pacific"), appeared before the Court, with an offer of $2.75 million for substantially the same assets as Outdoor Cycle sought to buy. The Petitioning Creditors, the Committee, and CIT stated their concerns over whether

Debtor should preside over the sale without oversight and expressed a "need for speed." Debtor's primary value consisted of high end bicycles and alleged intellectual property rights. These parties asserted that a sale before the end of summer of 2009 was necessary to maximize the value to be derived from the auction.

The Committee advised that it had renegotiated GCP's proposed fee to be 15% of all sales proceeds above the new $2.75 million offer, plus a $25,000.00 retainer. However, the Debtor did not have $25,000.00 to pay GCP, and CIT did not agree to advance or carve out this $25,000.00. The Debtor stated that it was not involved in the negotiations over GCP's proposed retention. The Court noted that no retention application or disinterestedness affidavit of GCP had been filed. [dkt item 113, p. 11]

At the conclusion of the June 8 Hearing, this Court approved certain bid procedures on the record, including a requirement that, once the sale process started, IH Inc. could not back out of the sale process and had to close if the Court approved a sale, to which IH Inc. agreed. This Court scheduled an auction for the morning of July 13, 2009 (the "Auction"), and a hearing for the afternoon of July 13, 2009, to consider whether to approve the sale (the "Sale Hearing"). [dkt item 119, ¶ 11]   The parties were directed to submit a proposed bid procedures order for the Court's consideration, which they did. The parties summarized GCP's compensation arrangement in the proposed Bid Procedures Order.

This Court entered a bid procedures order on June 22, 2009 (the "Bid Procedures Order"), [dkt item 119], which provides, *inter alia*, as follows:

13. General Capital Partners, LLC ("GCP") may be retained by the Committee to assist the Committee in seeking to obtain Bids for the Assets in addition to the Bids made by Outdoor Cycle and Pacific Cycle, and to otherwise assist the Committee with respect to the Proposed Sale, nunc pro tunc to June 15, 2009, as follows.

(a) GCP's compensation for such retention, payable from the first proceeds of the sale of the Assets, shall be (i) a transaction fee in an amount equal to fifteen percent (15%) of "Gross Value" (as defined below) above $2,750,000 (the "Base Fee"), provided that GCP shall not be entitled to a transaction fee in the event that (a) either or both of Outdoor Cycle and/or Pacific Cycle bid at the Auction and there are no other third party Complying Bidders, or any Complying Bid submitted by Outdoor Cycle or Pacific Cycle prior to the Auction is deemed the highest and/or best bid at the Auction, (b) the Bid of either Outdoor Cycle or Pacific Cycle resulting from such competitive bidding is determined by the Court to be the highest and/or best bid for the Assets in the Proposed Sale and (c) such highest and/or best bid by either Outdoor Cycle or Pacific Cycle is closed on and the Proposed Sale is thereby consummated, plus (ii) reimbursement of reasonable verified expenses in an amount of $1,000 (the "Expense Reimbursement").

[dkt item 119, ¶ 13 (internal footnotes omitted)]

This Court required under paragraph 13(e) of the Bid Procedures Order that GCP demonstrate its disinterestedness, as follows:

(e) The Committee shall promptly file and serve an affidavit of disinterestedness from GCP in connection with GCP's retention provided for above, which complies with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to the retention of similar professionals to perform similar services.

[dkt item 119, ¶ 13(e)]  The Bid Procedures Order also required GCP to publish notice of the auction sale on the various websites which had been identified by the Committee as important for the sale process.

On June 24, 2009, immediately following entry of the Bid Procedures Order,

GCP objected to being required to publish notice of the auction on the identified websites. [dkt item 122]  GCP stated that it had not agreed to undertake the expense of this advertising, and that, in its view, the web notices would not enhance the bidding process.  The parties agreed to revise this aspect of the Bid Procedures Order by a stipulation removing the web advertising, which this Court approved on June 26, 2009. [dkt item 124]

Although the June 22, 2009 Bid Procedures Order required an affidavit of GCP's disinterestedness to be filed promptly, no such affidavit was filed until July 8, 2009. [dkt item 131]  No separate application for retention of GCP has been filed.  No proposed Order for retention of GCP has been submitted to the Court for entry, and, as of the date of this opinion, no formal order of retention has been entered.

Ultimately, the assets of Debtor and IH Inc. were sold to Pacific for $5.22 million of total consideration, of which $5 million was cash at closing, which this Court found to be fair and reasonable. [dkt item 140]  The parties to this case have, by and large, conceded or at least not controverted that the auction produced an unanticipated very good result.

On July 24, 2009, GCP filed the GCP Application (Final Fee Application as Marketing Agent/Financial Advisor to the Committee). [dkt item 147]  In the GCP Application, GCP states that it was retained on June 22, 2009, pursuant to the Bid Procedures Order.  Further, GCP describes the services it rendered on behalf of the estate. [dkt item 147]  A hearing on the GCP Application was scheduled for September 23, 2009 (the "September 23 Hearing").

Objections to the GCP Application were filed by Debtor, IH Inc., and the principal of Debtor and IH Inc. [dkt items 214, 216]  The Committee filed a response in support of the GCP Application. [dkt item 220]  GCP filed a reply to the objections. [dkt item 219]

At the September 23 Hearing, GCP's representative, Gregory Barrow, Esq., testified to the services GCP rendered.  At the September 23 Hearing, GCP did not provide any time records of its services in support of its Application.  When questioned, Mr. Barrow was unable to quantify the amount of time GCP spent on this project. Following the September 23 Hearing, this Court approved an interim award to GCP of fees of $185,250.00, and denied GCP's request for $6,454.39 of attorneys fees incurred in seeking relief from the requirement that it publish notice of the auction on various websites. [dkt item 222]  The Court took consideration of a final award for GCP under submission.

GCP asserts, in essence, that it was the primary cause of the auction resulting in the opening bid of $2.75 million increasing to $5.22 million.  However, GCP is not alone in claiming credit for the unexpected results of the auction process.  The Petitioning Creditors have claimed credit. Additionally, Outdoor Cycle, and an affiliate, Rand International Leisure Products, LLC, have claimed credit.  The Petitioning Creditors request $193,463.00 in attorneys fees and expenses of $2,109.90 from the sales proceeds, pursuant to Sections 503(b)(3) and (b)(4) of the Code. [dkt 163]  Outdoor Cycle, which had made the initial $2 million offer the Debtor had accepted, has asserted claims under Sections 105 and 503(b), seeking $118,951.00 in fees and $2,466.72 in expenses from the sales proceeds. [dkt item 154]  Outdoor Cycle's request include a

claim for $34,705.00 for a valuation expert it had employed.  The Petitioning Creditors'

and Outdoor Cycle's requests are under submission with the Court.

No allocation of the sales proceeds has been agreed to between the estate and

IH Inc. Trial of the IH Adversary is now scheduled for April 2010.

<u>**Legal Analysis**</u>

The Bankruptcy Code provides two different approaches to determine retention

of and compensation for a professional in a Chapter 11 case to be employed to

represent the interests of the bankruptcy estate: (1) retention under Section 327(a), for

which reasonable compensation is determined after the services have been provided,

based on the factors identified under Bankruptcy Code Section 330(a)(3); or (2)

compensation which is pre-approved pursuant to Section 328(a)[3].

Assessing reasonable compensation under Section 330(a)(3) requires a

consideration of the benefit to the estate and the necessity of such services:

> In determining the amount of reasonable compensation to be awarded the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including -
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and

---

[3]  Section 328(a) allows for retention "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis...." 11 U.S.C. § 328(a).

nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

However, "if the court pre-approves the terms and conditions of the retention under section 328(a), its power to amend those terms is severely constrained." *In re Smart World Techs., LLC*, 552 F.3d 228, 232 (2d Cir. 2009)(setting standard for adjustment of compensation for a professional retained under Section 328(a)). A bankruptcy court may only vary the compensation from what is provided in the retention order "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *Id*. at 232.  The Second Circuit expressly stated that the 328(a) and 330(a) inquiries are "mutually exclusive," as "[t]here is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328." *Id*. at 232-33.

GCP asserts it is entitled to compensation under Section 328, and that its retention was approved as a part of the Bid Procedures Order. [dkt item 147, ¶¶ 25, 30]  Thus, the first issue presented by the GCP Application is whether compensation for GCP is to be determined under Section 330(a) or Section 328(a).  Having determined that GCP was to be retained under Section 327, and that, therefore, Section 330(a) governs the reasonable amount of compensation to be awarded to GCP, the Court must

then determine whether GCP should be compensated based, in whole or in part, on the

hours it worked and the hourly rates it would charge.  Having determined that hours and

rates are not relevant for the type of services GCP provided, the Court must then

determine the standard for assessing the reasonable amount of compensation, and how

to apply that standard to the facts presented here.  Although this Court has determined

the standard to apply, there are not enough facts known to finally establish GCP's

compensation.

A.     *GCP's Compensation Should be Determined Under Section 330 and Not 328(a)*

GCP asserts that its retention was effected under Section 328(a) through the Bid

Procedures Order. This is incorrect.

Typically, the starting point for compensation of a chapter 11 professional is the

retention order; however, it is also appropriate to consider the events surrounding the

retention of the professional.  *See Smart World*, 552 F.3d at 232.  The issue as stated

by the Second Circuit in *Smart World*, and as an issue of first impression, was "How

does a court determine whether a bankruptcy court has 'pre-approved' a debtor's

retention of a professional pursuant to 11 U.S.C. § 328(a)?" *Id.* at 229.  To make this

determination, the Second Circuit directs bankruptcy courts to consider "the totality of

the circumstances, including whether the professional's application, or the court's order,

referenced section 328(a), and whether the court evaluated the propriety of the fee

arrangement before granting final, and not merely preliminary, approval." *Id.* at 233.

Here, as noted, no application to retain GCP was ever filed, nor was a formal

order entered authorizing GCP's retention.  The request of the Committee to retain GCP

was injected during the hearings to establish bid procedures. No reference was made to Section 328(a) at the June 8 Hearing or in the Bid Procedures Order. No marketplace or market-driven determination was made regarding what a similar fee would be for GCP in the marketplace outside of bankruptcy. No evidence was submitted to this Court in June or July of 2009 of what the market place would have considered a reasonable fee for GCP.

 The Bid Procedures Order provides that the Committee "may retain" GCP. [dkt item 119, ¶ 13] The Bid Procedures Order required GCP to promptly file and serve an affidavit of disinterestedness. [dkt item 119, ¶ 14]  No chapter 11 professional can be retained under either Section 327 or 328 without an affidavit of disinterestedness. *See* 11 U.S.C. §§ 327(a), 328(a); FED. R. BANKR. P. 2014(a).  GCP's affidavit of disinterestedness was not filed until July 8, 2009. [dkt item 131]  Had GCP's affidavit established that it held a disqualifying conflict, it would not have been retained.

Moreover, the Local Bankruptcy Rules for the Eastern District of New York provide that, in addition to the requirements of Bankruptcy Rule 2014 and Section 327 of the Bankruptcy Code, the application for retention "shall be accompanied by a verified statement of the person to be employed stating that such person does not hold or represent an interest adverse to the estate except as specifically disclosed therein, and where employment is sought pursuant to Bankruptcy Code § 327(a), that the professional is disinterested." E.D.N.Y. LBR 2014-1(b).  Thus, GCP was clearly not formally or finally retained in the Bid Procedures Order.

Finally, although GCP correctly states that this Court addressed its retention at

the June 8 Hearing on bid procedures, this Court also stated as follows:

> The Court will allow the debtor to continue in the sale process which is currently underfoot to further explore its ability to sell assets for the purpose of generating a net benefit to the bankruptcy estate above the alleged CIT debt and the administrative burden of the process itself.

[dkt item 113, p. 5]. Therefore, it was clear that the Court's focus and the totality of the circumstances was for GCP's retention to be considered under Section 327, with reasonable compensation for GCP to be measured under Section 330(a)(3), after benefit to the estate of the sales process could be ascertained. As no formal order of retention has been entered, this Court will contemporaneously enter an Order authorizing GCP's retention under Section 327 as of June 15, 2009, the date set out in the Bid Procedures Order.

B.    *The Reasonable Compensation to GCP Should Not Be Determined Based on Hours Expended and Rates Charged*

GCP asks for a purely results-oriented payment—the auction resulted in a sale for $5.22 million, and it applies a simple mechanical formula derived from the Bid Procedures Order to calculate a fee. GCP also asserts that the number of hours it worked is irrelevant. GCP is partially correct.

Reasonableness under Section 330(a) calls for more than application of a simple formula. However, reasonableness of a chapter 11 professional's fee need not always consider hours worked or billing rates. This principal is discussed in two fairly recent cases from the Bankruptcy Court for the Southern District of New York, which address the Section 330(a) reasonableness analysis when applied to a financial advisor seeking a transaction fee.

In *In re XO Communications, Inc.*, 398 B.R. 106 (Bankr. S.D.N.Y. 2008), Judge Gonzalez addressed a fee request of Houlihan Lokey Howard & Zukin Capital ("Houlihan"), for its services as restructuring financial advisor to the debtor, XO Communications, Inc. ("XO").  Houlihan had been retained prepetition "to assist in exploring a variety of investment and de-leveraging alternatives, including a stand-alone restructuring and third-party investment scenarios.  "As market conditions worsened, alternatives were expanded to include restructuring and investment scenarios that could be implemented under Chapter 11." *Id.* at 109.

Ultimately, after a Chapter 11 was filed, XO filed a plan and disclosure statement, and sought to retain Houlihan pursuant to the terms of an Engagement Letter, which provided that XO was to pay Houlihan a monthly fee of $250,000.00 (the "Monthly Fee"), reimbursement of expenses, and a transaction fee (the "Transaction Fee").  XO was exploring different reorganization options, and XO had assisted in two different exit scenarios, referred to as Plan A and Plan B.  Houlihan's retention order provided that its fee in connection with Plan A would be under Section 328(a), but that a fee in connection with Plan B would be considered under Section 330.  Ultimately, a Plan B transaction was implemented. *In re XO Commc'ns, Inc.*, 398 B.R. at 108-110.  Houlihan sought a $4 million transaction fee, and the Court initially awarded it $2 million in addition to $2 million it had been paid in Monthly Fees.  After an appeal, on remand, the court awarded Houlihan an additional $1 million.  The award to Houlihan and the analysis thereof is very fact specific, and those facts are not relevant to this case.

However, the holding in XO is notable for this case.  First, the court differentiated

financial advisors and investment bankers seeking a transaction fee from professionals

seeking hourly compensation, noting that time spent and rates charged do not apply:

> Rather, relevant factors to consider in assessing a financial
> advisor's transaction fee are (i) whether the financial advisor's
> services were necessary and beneficial to the estates at the time
> they were rendered, and (ii) whether the compensation is
> reasonable based on the customary compensation charged by
> comparably skilled practitioners in cases outside of bankruptcy.

*Id.* at 113.  Further, the court stated reasonableness in those circumstances requires a

"nexus between the tasks performed and the results achieved." *Id*. at 113-14.

Judge Gonzalez further stated that if there has been no "actual determination

prior to or at the time that the services were rendered of what the marketplace would

bear, the court must look at the nexus between what was achieved, *i.e.,* the

restructuring of the debt, and the impact of the advisor's effort in that regard." *Id.* at 116

(referring to the "market-driven" approach applied by the Second Circuit in *In re Ames*

*Dep't Stores, Inc.*, 76 F.3d 66, 71(2d Cir. 1996)).

The second helpful opinion from the Southern District Bankruptcy Court is *In re*

*Northwest Airlines Corp.*, 400 B.R. 393 (Bankr. S.D.N.Y. 2009).  In *Northwest*, Lazard

Fréres & Co., LLC ("Lazard"), served as one of two financial advisors to the Official

Committee of Unsecured Creditors ("Northwest Committee").  At the end of the case,

Lazard sought a $3.25 million "completion fee."  The bankruptcy court had entered an

interim order authorizing the Northwest Committee to retain Lazard as a financial

advisor, under which Lazard was to receive monthly fees of $275,000.00, plus

expenses.  However, the interim retention Order "did not pre-approve a completion or

success fee."  *Northwest Airlines Corp.*, 400 B.R. at 395.  Lazard was retained by final

order approximately nine months later.  "Neither the Application nor the Interim

Retention Order nor the Final Retention Order defined goals for Lazard, such as a

recapitalization, a percentage repayment for creditors or other "success," which, if met,

would entitle it to a bonus." *Id*. at 396.  Notwithstanding the contours of its retention,

Lazard filed a final fee request, seeking fees based on its monthly fee totaling

$5,455,645.00, reimbursement of expenses for the same period in the amount of

$167,915.12 and a completion fee (the "Completion Fee Request ") in the amount of

$3.25 million, for a total compensation request of $8,873,560.12.  According to its Final

Fee Application, during the period from October 6, 2007 through May 31, 2007, Lazard

rendered 6,227.2 hours of services in connection with the Debtors' cases.[4]

Judge Morris quoted from *XO* that, in conducting the Section 330(a) analysis,

"the court must look at the nexus between what was achieved ... and the impact of the

advisor's effort in that regard." *Id*. at 399.  Lazard stated that, among other things, it

"evaluated the Debtors' restructuring initiatives, and in certain respects, helped to

develop the Debtors' strategy with respect to critical aspects of their organization."  *Id*.

at 400-01. The court then closely reviewed the testimony form the hearing on the fee

request, and generally categorized Lazard's efforts as advising, assisting, and

analyzing, but not actually negotiating with the debtor or any party that would have

provided consideration to the estate or its creditors; nor did Lazard negotiate with any of

the airline lessors. *Id*. at 400-01.  The court further stated:

---

[4]  Judge Morris also noted that she would consider the hours expended by Lazard and how those hours
would translate to hourly rates, because "unlike the scheme ordinarily utilized by other financial advisors in
bankruptcy cases, the terms of Lazard's retention are devoid of other specific factors that the Court can
look to in order to assess reasonable compensation" Id.  at 399.

> Of course, analysis and advice are critical to the success of any major restructuring. It does not necessarily follow, however, that such tasks command a $3.25 million "completion fee" where the professional has already been well compensated. While Lazard surely participated in the reorganization and contributed to it on some level, Lazard made no effort to quantify the value of its contributions. Lazard has not shown that it played a vital and indispensable role at any stage of the reorganization, such as the confirmation of the Debtors' plan. Under the circumstances of this case, the nexus between the restructuring in this case and Lazard's efforts is tenuous.

*Northwest Airlines Corp.*, 400 B.R. at 401.  The court denied the Completion Fee Request.

Here, as noted, no marketplace or market-driven determination was made incident to entry of the Bid Procedures Order regarding what a similar fee would be for GCP in the marketplace outside of bankruptcy.  No evidence was submitted to this Court in June or July of 2009 of what the market place would have considered a reasonable fee for GCP.  No such evidence was submitted in connection with the September 23 Hearing.  Thus, while this Court concludes that GCP's fee should not be based on the hours worked or an hourly rate, GCP must still demonstrate how its services positively impacted the results of the auction and benefitted the estate.

C.    *No Determination Can be Made at This Juncture as to How GCP's Services Positively Impacted the Auction and Benefitted the Estate*

Based upon the testimony at the September 23 Hearing, it is difficult to ascertain the nexus between what was achieved from the auction sale and GCP's impact in generating that result.  GCP set up what it called a "virtual data room."  That data room consisted solely of raw data compiled by or obtained from the Debtor.  GCP did not conduct any analysis of this data, did not prepare any projections based upon this data,

did not conduct any valuations of Debtor or IH Inc., and did not create a business model that any prospective bidders might utilize in determining whether to bid or how much to bid.  GCP argued that it was brought in to sell a going concern and not just bicycles or other inventory, yet GCP did not prepare any reports, projections or summaries that could be utilized to quantify any business value or going concern value of Debtor or IH Inc. above the raw value of the inventory and other items being sold.  GCP did not prepare any summaries or reports of how any potential bidder could make a strategic acquisition and thereby enhance that party's ongoing or hoped-for business ventures. GCP did not assist any potential party to obtain funding or otherwise position itself to be a qualified bidder, able to close within the time frames under which the sale had to close.

GCP did have some role in helping to vet potential bidding parties that may or may not have been qualified to bid and close.  However, in addition to Outdoor Cycle and Pacific, only three parties, referred to as Dicks, CARE, and Kent, bid at the auction. Pacific Cycle opposed Kent being considered as a qualified bidder, and the Court held a hearing thereon. [dkt items 134, 137]  The Committee did not oppose Kent being considered as a qualified bidder.  GCP did not testify at the hearing thereon.  After the hearing, this Court approved Kent as a qualified bidder.  As to the other two bidders. Dicks was easily qualified based on readily available public information, and GCP was not sure how CARE was qualified.

GCP also consistently asserted that it brought these three bidders to the auction, to compete with Outdoor Cycle and Pacific.  However, Debtor had been involved in

prepetition negotiations with Dicks.  CARE was an affiliate of a creditor of Debtor who had received notice of the sale procedures and other proceedings in the case.  Kent, Dicks, and CARE were all on a list of seventy-plus prospects that Debtor provided to GCP and the Committee well prior to the auction, pursuant to this Court's Order.

Finally, GCP argues that it created "buzz" about the auction.  The "buzz" value of GCP's efforts, however, is difficult at this juncture to determine.  Moreover, it is difficult at this juncture to ascertain the effect of GCP's efforts.  What was known at the time GCP became involved in the sale process was that there were two offers on the table—$2 million from Outdoor Cycle and $2.75 million from Pacific.  GCP asserted that it was a producing cause of Pacific's $2.75 million bid, but Pacific appeared at the June 8 Hearing on its own and asserted its intention to bid, without any apparent impetus from GCP. [dkt item 113, at pp. 5, 6]  The cause and effect between GCP's efforts and the results of the auction obtained remains unclear; in other words, GCP may have been as a much a witness to the outcome of the auction as a producing cause of it.

Moreover, as noted, no allocation of the sales proceeds has been made between Debtor and IH Inc.  Although GCP's fee is to be charged against the gross sales proceeds, to determine benefit to the estate, Debtor's share of the proceeds must first be established.

## Conclusion

Thus, at this juncture, without being able to determine the nexus between GCP's efforts and the results of the auction, and how the estate benefitted from GCP's efforts, it is premature to render a final ruling on the GCP Application.  Therefore, final

determination of the GCP Application is deferred until after resolution of the IH

Adversary, and after resolution of the applications of the Petitioning Creditors and

Outdoor Cycle for substantial contribution awards.



Dated: February 4, 2010
    Central Islip, New York

                       **Alan S. Trust**
         **United States Bankruptcy Judge**